[No. 12703. Department One. — June 2, 1890.]

GEORGE A. WORN, ADMINISTRATOR, ETC., APPELLANT, *v.* J. D. FRY, EXECUTOR, ETC., ET AL., RESPONDENTS.

SETTLEMENT OF PARTNERSHIP IN MINING STOCKS — DIVISION OF STOCK — ORDER TO SELL AND BUY — LIABILITY OF BROKERS. — When a partnership has dealt in mining stocks in the name of one of its members, through brokers, and an order in writing is given in the name of such member to sell certain specified shares of stock, for the purpose, expressed in the order, of closing up the partnership account and opening an individual account with each member, and each partner gives at the same time an order to the brokers to buy for him one half of the same shares ordered to be sold, if the object of the several orders is effectuated according to the intention of the parties by a division of the stock between them, without any sale or repurchase, it appearing that the partners had been jointly interested in many other stocks included in the account of the partner

giving the order to sell, and that he expressed no dissatisfaction with the division, his executor cannot recover from the brokers for conversion of the stock divided, nor are they liable to such executor for the original cost of the stock ordered to be sold.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order denying a new trial.

The facts are stated in the opinion.

*Henry Thompson*, and *Ben. Morgan*, for Appellant.

*Gunnison & Booth*, and *W. H. L. Barnes*, for Respondents.

GIBSON, C.—This appeal comes from a judgment in favor of defendants and an order denying a new trial entered and made in an action to recover the value of certain shares of the capital stocks of certain mining companies alleged to have been wrongfully converted by defendant Fry's testator and defendant Neal while doing a partnership business as stock-brokers under the firm name of Fry, Neal & Co.

It appears from the record that on October 1, 1878, plaintiff's testator, Bullock, who, for some time prior thereto, had been engaged in the business of buying and selling shares of mining stocks, began to deal with Fry, Neal & Co., stock-brokers in San Francisco. This firm, acting as his brokers, bought and sold a number of shares of mining stocks for Bullock between the above date and November 2, 1877. On the last-mentioned date Mrs. Wheeler, Bullock's mother, was, upon her own application, appointed the guardian of his person and estate, on account of his mental incapacity, Bullock having, on October 22, 1877, the date of her application, been adjudged insane, and committed to the asylum at Napa. November 9, 1877, upon an order of sale made in the guardianship proceedings, some of the shares of stock then in Fry, Neal & Co.'s hands were sold, and on

the 26th of the same month Mrs. Wheeler was removed
from the position of guardian, and on January 2, 1878,
William Doolan was appointed in her stead. January
17, 1878, Bullock, on his petition to the probate court,
was adjudged to be sane, and was on the same day dis-
charged from the asylum. Two days afterward, Doolan,
as his guardian, delivered to Bullock $6,778.95 and cer-
tain mining stocks belonging to Bullock, and subse-
quently filed his account as guardian, and was discharged
from his trust. In the latter part of January, 1878, Bul-
lock renewed his dealings with the firm of Fry, Neal &
Co., and continued to employ them as his brokers until
his death, in October of the same year.

In April of the same year, the firm, which consisted
first of J. D. Fry and Charles S. Neal, was changed by
the withdrawal of J. D. Fry and the substitution in his
place of E. M. Fry, who, with Neal, constituted the new
firm. They retained and continued the same business
under the name of the old firm. October 9, 1878, Bul-
lock died suddenly, and left a will, by which he gave all
his property to his mother and nominated her as his sole
executrix. She, however, renounced her right to act as
such, and on the 17th of the same month W. W. Crane
was appointed administrator with the will annexed. By
the inventory and appraisement filed by him it appeared
that the only shares of mining stocks belonging to Bul-
lock's estate were thirteen hundred Endowment, three
hundred Senator and fifty Union shares.

November 5, 1878, Crane, as such administrator, ob-
tained from Fry, Neal & Co., upon an accounting with
them, a balance of about twenty thousand dollars. The
only persons Crane obtained information from concern-
ing the mining stocks Bullock died possessed of were
the members of the firm of Fry, Neal & Co., but they
were not the only persons possessed of such knowledge.

Crane brought the administration of the estate to a
close on June 6, 1883, when he was discharged from his

trust as such administrator. Some time after the death
of Bullock, and before September 1, 1879, the firm of
Fry, Neal & Co., composed, as above shown, of E. M.
Fry and Charles S. Neal, was dissolved and the assets
thereof divided. Thereafter, on December 29, 1882,
Neal, on his own petition, was adjudged insolvent, and
on April 2d of the following year was discharged from
all his debts, except such debts as were excluded by the
insolvency act of April 16, 1880. Fry died on October
20, 1884, leaving a will, whereby the defendant J. D.
Fry was nominated as the executor thereof, and, as such,
letters testamentary were issued to him November 24,
1884.

The plaintiff, with the consent and upon the request
of Bullock's mother, on the 21st of August, 1885, ob-
tained letters *de bonis non* in the matter of Bullock's
estate, upon the ground that property belonging to the
estate had been discovered since the decree of final dis-
tribution had been made. On the 22d of September,
1885, the plaintiff, as such administrator, presented to
J. D. Fry, the executor of the will of E. M. Fry, a claim
against Fry's estate for the value of certain mining
stocks that belonged to Bullock at his death, alleged to
have been wrongfully converted by the firm of Fry, Neal
& Co., which claim was, by J. D. Fry, as such executor,
rejected and returned to plaintiff. This claim was based
upon the supposed discovery of property next referred
to. Prior to November 13, 1885, Neal and Fry, upon a
citation issued therefor, appeared in the matter of Bul-
lock's estate, and were examined concerning the wrongful
conversion of certain shares of mining stocks. Upon
this examination it appeared that from the time Bullock
renewed his dealings with Fry, Neal & Co. until his
death, this firm had, among other transactions for Bul-
lock, purchased for and charged to him 1,890 shares of
Sierra Nevada, 700 shares of Mexican, 1,750 shares of
Gould & Curry, and 130 shares of Bulwer mining stocks;

and that between the shares so purchased and charged
and those of the same shares accounted for by the firm
there were the following apparent differences, viz.: 150
shares of Sierra Nevada, 250 shares of Mexican, 615
shares of Gould & Curry, and 30 shares of Bulwer.
These discrepancies form the basis of the present action.

From the evidence adduced at the trial, it seems Bul-
lock had, at some time not disclosed, formed a partner-
ship regarding certain mining stocks with one W. J.
Collins, by the terms of which the latter furnished in-
formation, or "pointers," concerning the purchase and
sales of certain mining stocks, and the former the capital
to make the purchases, and the profits were equally
divided between them; but the business was conducted
in the name of Bullock alonè.    September 3, 1878, Bul-
lock notified Fry, Neal & Co. of his partnership with
Collins, and at the same time ordered them to sell six
hundred shares of Gould & Curry, seven hundred shares
of Mexican, and three hundred shares of Sierra Nevada.
On the 18th of the same month he gave written instruc-
tions to the firm to charge to his account and credit to
that of Collins one half of the profits shown by his (Bul-
lock's) account, less the amounts already paid in.    And
on the same day he gave an order in writing to the firm
to sell for him six hundred shares of Gould & Curry,
seven hundred shares of Mexican, and three hundred
shares of Sierra Nevada, for the purpose, expressed in
the order, of closing up the partnership account of him-
self and Collins and of opening an individual account
with each of them.    In connection with the order, and
to carry out the purpose expressed in it, Bullock and
Collins gave to the firm, with the above order, their in-
dividual orders in writing to buy for them, respectively,
one half of the shares Bullock had ordered to be sold.
The evidence shows that these orders were not executed
according to their terms, but, instead, the object of the
orders was effectuated, according to the intention of

Bullock and Collins, by dividing the stock between them. In making this division Bullock was charged with the portion of each number of the shares referred to upon the stock ledger of Fry, Neal & Co., which shares they delivered to Collins. It is conceded by appellant's counsel that Collins received the shares as shown by the stock ledger, but they contend that if the several stocks had been sold, in accordance with the order of Bullock, for the prices they would have respectively brought on September 18, 1878, the date they were ordered to be sold, instead of having been delivered to Collins, Bullock's estate would have received twenty-two thousand dollars more than it did receive.

Respecting the object of the order, Neal the surviving member of the firm, testified "that the order was given for the purpose of dividing the account. Those papers were taken by Mr. Fry as the simplest way of taking a paper authorizing us to divide the account with Mr. Collins." In this he is corroborated by the testimony of Collins, and there is no evidence to the contrary.

According to the argument of the appellant, if the 300 shares of Sierra Nevada bought on the 3d and 10th of September, 1878, for $24,000, had been sold on the 18th of the same month, in accordance with Bullock's order, for $163.50 per share, the market value of such stock on that date, the amount that could have been realized would have been $49,050, which, less $24,000, the cost of the shares, would have left $25,050 profits, of which Collins would have been entitled to one half, viz., $12,525, but instead of this, he received 150 shares of the stock, worth on that date $24,525, or $12,000 more than one half of the profits would have amounted to, and Bullock just that amount less than he was entitled to.

This argument is based on the assumption that Bullock and Collins were only interested together in the stocks specified in Bullock's order of sale. But the evidence shows they were interested in a large number of

shares of different mining stocks, and that the business was carried on in the name of Bullock. Now, when they came to settle their partnership affairs, they must have had some agreement or understanding as to the division of the stocks specified in Bullock's order of sale in order to and which was to completely settle up the affairs of their partnership. Bullock transacted business with Fry, Neal & Co. after the 19th of September, 1878, the date the shares were delivered to Collins, and until he died, on the ninth day of October following, and there is nothing to indicate that he was dissatisfied with the transaction. He was, it seems, a shrewd and successful dealer in mining stocks, and although he was rendered incompetent to transact business for a few months, which time he spent in the asylum, at the time the division of the stocks was made, and from thence until his death, he was possessed of his usual business sagacity.

The thirty shares of Bulwer that were delivered on October 3, 1878, were delivered, according to the evidence, in the course of business, to either Bullock or his order, and were, consequently, accounted for.

The books of Fry, Neal & Co., it is admitted, were kept in a very careful manner, but because the division of the stocks is not explained in full therein appellant's counsel would have us infer that a fraud had been perpetrated upon Bullock or his estate; but we do not think that such an inference can be drawn from the books alone, and certainly not in view of the evidence explanatory of the entries claimed to be suspicious. On the contrary, we think the evidence, taken as a whole, fully supports the findings of fact herein, and shows, as stated in one of the findings, " that all the mining stocks purchased or sold by said firm of Fry, Neal & Co. for or on account of said Frank Dyer Bullock, deceased, were honestly and justly accounted for to him or his representatives, and that the actions of said Fry, Neal & Co. do not show the least suspicion of fraud."

Our conclusion that the findings are sustained by the evidence disposes of the only contention made on this appeal, and we therefore advise that the judgment and order be affirmed.

BELCHER, C. C., and FOOTE, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment and order are affirmed.

Hearing in Bank denied.